FILED
07/06/2017
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 1, 2017

**IN RE  ZANE W.**

**Appeal from the Juvenile Court for Knox County**
**No. 148425   Timothy E. Irwin, Judge**

_____

**No. E2016-02224-COA-R3-PT**

_____

Mother appeals the termination of her parental rights based on the following grounds:  (1) abandonment by wanton disregard for the welfare of the child; (2) persistence of conditions; and (3) substantial noncompliance with the permanency plans.  We reverse the grounds of persistence of conditions and substantial noncompliance.  We, however, affirm the remaining ground of abandonment by wanton disregard for the welfare of the child and the trial court's determination that termination of Mother's parental rights is in the best interest of the child.  Reversed in part, affirmed in part, and remanded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part; Reversed in Part; and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and ANDY D. BENNETT, J., joined.

Ben H. Houston, II, Knoxville, Tennessee, for the appellant, Rebecca B.

Herbert H. Slatery, III, Attorney General and Reporter; Brian A. Pierce, Assistant Attorney General, for the appellee, State of Tennessee, Tennessee Department of Children's Services.

**OPINION**

**BACKGROUND**

Zane W. ("the child") was born in January 2011 to Rebecca B. ("Mother") and Christopher W. ("Father").[1]  During much of Mother's pregnancy with the child, Mother

_____
[1] In cases involving termination of parental rights, it is the policy of this Court to remove the names of

stayed at a drug treatment facility in Lewisburg, Tennessee, to address her cocaine addiction. At the time of the child's birth, however, Mother was living in a halfway house in Nashville. Shortly thereafter, Mother moved to live with a high school classmate in Hendersonville for about four to five months and later to Knoxville to live with her aunt and uncle for about eight months. Over the next year, Mother lived with various other friends she met through her drug recovery programs throughout Middle Tennessee and with relatives. In 2012, Mother rented a house but moved to another house across the street in 2015. As of the date of trial, Mother had been living in the same house since January 2015.

The Tennessee Department of Children's Services ("DCS") first became involved with Mother and the child on March 5, 2012, when a case was opened for allegations of lack of supervision. Apparently, Mother had left the sleeping child in her car while she shopped. The case was closed, however, on March 30, 2012.

In March 2014, Mother placed the child with Safe Families for the third time in the child's life.[2] Mother visited the child on weekends until her arrest on April 23, 2014, in Wilson County, Tennessee, for public intoxication and simple possession of a controlled substance. It is unclear when Mother was released from incarceration. Due to Mother's lack of contact, Safe Families concluded that it would be unable to continue providing care for the child after June 30, 2014. On or around this period of time, Mother moved in with Father in an attempt to reconcile with him despite having had domestic violence issues with him in the past. After Father allegedly physically abused Mother, she moved in with her boyfriend before moving into a domestic violence shelter. In July 2014, DCS received a referral alleging abandonment of the child. As a result, DCS petitioned for, and was awarded, temporary legal custody of the child in July 2014. The child was placed in kinship foster care with Mother's brother and sister-in-law ("Uncle" and "Aunt") in July 2014.

The first permanency plan was developed at a Child and Family Team Meeting on August 1, 2014, and was ratified on September 10, 2014. At that point, Mother had just completed partial hospitalization at Ten Broeck Tennessee, a program specializing in the treatment of adults with psychiatric disorders and chemical dependency, and stepped down to intensive outpatient treatment. Under the August 1, 2014 permanency plan, Mother was required to: (1) complete parenting classes; (2) participate in therapeutic visitation; (3) follow aftercare recommendations; (4) submit to random drug screens and pass them; (5) refrain from associating with known drug users; (6) sign a release of information; (7) not incur new criminal charges and follow the rules of probation; (8)

---

minor children and other parties in order to protect their identities.

[2] Safe Families is an alternative to foster care, where parents voluntarily place children with host families for temporary care. When the child was approximately six months old, Mother placed the child with Safe Families in Knoxville for about six weeks. When the child was about eighteen months old, Mother again placed the child with Safe Families for about six weeks.

cooperate with requirements for parents with children in state custody; (9) comply with all court orders and cooperate with DCS by maintaining contact and sending verification of completion of the goals; (10) visit regularly; (11) attend court hearings and meetings; (12) pay child support; (13) keep a clean and safe home; (14) avoid illegal activity in the home; (15) obtain a legal source of income and provide proof; (16) complete a mental health assessment and follow all aftercare recommendations; (17) indicate a willingness to accept treatment for mental health issues; and (18) address anger management and domestic violence through counseling. Mother's boyfriend was initially made part of this plan; however, Mother sought to have him removed from the plan because of his issues with alcohol.

After a hearing, an agreed order was entered on February 20, 2015. Therein, Mother stipulated to a finding by clear and convincing evidence that the child was dependent and neglected based upon her mental health issues, domestic violence in the home, alcohol and drug issues, criminal conduct, and lack of stable housing. By March 2015, Mother had successfully completed the requirements of the first permanency plan and was granted physical custody of the child on a trial basis on the condition that Mother avoid contact with her boyfriend.[3] After a hearing on July 9, 2015, Mother was restored to full custody of the child upon a finding that she had completed the requirements of the permanency plan and that DCS's involvement was no longer necessary.

The child was returned to foster care just one month later, however. Mother, while visibly intoxicated, took a cab to pick the child up from day care at around 6 p.m. A DCS investigator, who arrived at her home approximately two hours later, observed that Mother was heavily intoxicated; as a result, the child was removed from Mother's home. DCS was again awarded temporary legal custody of the child.

A second permanency plan was created at a Child and Family Team Meeting on August 31, 2015, and ratified on October 21, 2015. Mother was informed that she had to essentially redo every step on the plan and complete a new alcohol and drug assessment, with the addition of completing anger management classes. Although the exact details are unclear from the record, it appears that the child was initially placed with Uncle and Aunt; however, this placement was disrupted, and the child was then placed with the current Foster Parents on September 4, 2015.

On November 12, 2015, Mother stipulated to a finding of dependency and neglect supporting the child's removal from her home "based upon the [M]other's mental health and substance abuse issues for which she is currently participating in treatment." Mother subsequently appealed this order to the Knox County Circuit Court ("circuit court"). On February 11, 2016, Mother's appeal was resolved by an agreed order in which she

---

[3] It is unclear at this point why Mother was required to avoid contact with boyfriend, but it appears from the record that the boyfriend abuses alcohol.

acknowledged that she had mental health and substance abuse issues supporting a finding of dependency and neglect on the date of the removal, and DCS acknowledged that Mother had met the second permanency plan's requirements. Pursuant to this order, the child was restored to Mother's care on another trial home placement basis.[4]

Approximately two weeks later, on or about February 21, 2016, while the child was staying with a relative, Mother "did a bump of cocaine" with a co-worker after work because she believed that "it would help [her] clean up [her] house after [she had] worked all day." While Mother was cleaning up the house, she realized that she had forgotten about her appointment with her probation officer in Wilson County on the previous Tuesday. Mother set up another appointment to see her probation officer for February 23, 2016, the following Tuesday. On February 23, 2016, Mother left the child in the care of her boyfriend before she met with her probation officer. The probation officer requested a drug screen, but Mother admitted that she would test positive for cocaine and hydrocodone. As a result, Mother was arrested on the same day for violation of probation and was incarcerated for approximately thirty days. The boyfriend kept the child overnight but took the child to Mother's previous recovery sponsor the next day.

Mother's sponsor informed DCS of the situation, and DCS again removed the child into foster care. On or about February 25, 2016, the circuit court granted DCS's emergency motion to suspend the trial home placement and remanded the case to the trial court. Again, the child was initially placed with Aunt and Uncle for two months before the placement was disrupted; consequently, the child was again placed with the current Foster Parents on April 8, 2016, and has remained there ever since.

In the meantime, Mother began adult intensive outpatient treatment with Bradford Health Services ("Bradford") to address her substance abuse issues on March 31, 2016. On April 13, 2016, Mother completed a mental health assessment, which diagnosed her with Antisocial Personality Features and Narcissistic Personality Features and began individual counseling with Sarah Lord at Omni Community Health ("Omni"). On May 9, 2016, Mother completed her treatment with Bradford. At the time of her discharge, it was recommended that Mother continue with their weekly aftercare program for one year and attend recovery support groups regularly to help maintain her sobriety.

On April 5, 2016, DCS filed a petition to terminate Mother's parental rights.[5] On April 10, 2016, Mother was once again incarcerated for failure to appear in Putnam County on an outstanding citation for driving without a license. Mother served twelve hours in jail.

---

[4] It is unclear whether Mother was also restricted from having contact with boyfriend on this trial placement.
[5] Based on the trial transcript, Father surrendered his parental rights on the first day of trial.

A bench trial was conducted over the course of two days, September 14, 2016, and September 29, 2016. Mother was present on the first day of trial and was called as a witness in DCS's case-in-chief.

Mother testified that she entered a treatment facility and stopped using drugs for the child's protection when she became pregnant with him. Mother placed the child with Safe Families because she "wanted him to be safe and stable" while she was "in transition through some of the[] moves and unsure of where [she] would live." According to Mother, when the child was with Safe Families for the third time, Mother stayed with Father for two to three months because "he told [her] that he wanted to be a family . . . and [she] believed him." However, Mother testified that Father introduced drugs into the home, and Mother "became dependent on drugs, and then some domestic violence occurred." As a result, Mother "left him."

Mother recalled that, when DCS became involved the second time, Mother "had some wine" at a lunch date on August 7, 2015, at approximately 1:00 p.m. According to Mother, the wine affected her much more than she thought it would because she had not had a drink "in a long time." As a result, Mother testified that she took a taxicab to pick the child up from day care at 6:00 p.m. rather than drive. Mother explained to the day care worker that she had had some wine and therefore did not feel comfortable driving. At approximately 8:00 p.m., Mother heard knocking on the door; however, she did not immediately open the door because she was not expecting any visitors. When they identified themselves as the police department, Mother opened the door, and DCS was with them. Mother testified that she was cooperative.

Mother testified that, when she was arrested for her violation of probation, she left the child in her boyfriend's care. Mother admitted that she had previously been told that the child is not allowed to have contact with the boyfriend. Although her boyfriend had problems with alcohol and domestic violence in the past, Mother testified that he had been sober since October 2015. When asked about the details of the boyfriend's treatment, Mother gave very general answers about what she thought he had completed but then eventually stated that "you'd have to ask him." Mother testified that she currently is on better terms with her boyfriend "because he's not drinking."

After Mother completed her treatment at Bradford in May 2016, Mother testified that she continued to attend recovery meetings and obtained a sponsor. However, the letter from Bradford entered into evidence shows that it made the following recommendations: "attend[] continuing care [one] time a week for at least [one] year, continu[e] individual counseling, attend[] [twelve] step meetings in the community, follow[] all legal and DCS recommendations and obtain[] a sponsor to work through the [twelve] steps." Mother explained that, although she stopped participating in aftercare after just one month, she continued to attend "regular [r]ecovery meetings." According to Mother, aftercare and recovery meetings are virtually identical. Mother admitted that

- 5 -

she had not been giving DCS documentation of her attendance at these meetings because she "[did not] recall [DCS] requesting those records."

Mother testified that she was not aware of anything she had not completed on the third permanency plan. With respect to her mental health, Mother testified that she participated in individual counseling with Sarah Lord at Omni until Mother was discharged in June 2016. Although DCS introduced a document suggesting that Mother was discharged from Omni for noncompliance with care, Mother testified that she was discharged because Ms. Lord was leaving Omni. As a result, Mother testified that she appealed to Omni and was able to resume individual counseling with another therapist in September 2016, just a week prior to trial. Mother testified that, while she was resolving issues with Omni, she paid a therapist named Donise Clemmer "three to four times" out-of-pocket in order to address her mental health issues in the interim. Mother also introduced into evidence an online record of her attendance at Omni. The record shows that Mother completed several appointments at Omni for medication management between June 2016 through August 2016, the period during which Mother was discharged from Omni.

According to Mother, the child did not participate in feeding therapy while he was in her care. Mother explained that a nutrition specialist, recommended by the child's pediatrician, determined that the child did not need feeding therapy because Mother was giving him vitamins and supplements. Mother acknowledged that the child began feeding therapy in foster care because Foster Mother took the child to another pediatrician who had a different opinion. Although Mother testified that the child "seems very well adjusted" in the short-term, Mother was worried that "being severed from a mother that he loves very, very deeply, that he's very bonded with that, that this would have a negative effect on [the] child."

Mother testified that she has lived in the same place for a year and a half as of the date of trial. In addition, Mother was employed full-time with ProLogics and owns her business Hair that Cares, a mobile hair salon. Evidence was introduced showing that Mother was up-to-date on her child support obligations. Mother admitted that the child is in DCS custody "[b]ecause of [her] poor choices."

Leah Burke, a family-services worker for DCS, testified that she first became involved with the case on July 11, 2014, the first time the child came into foster care. According to Ms. Burke, Mother "completed each task" on the first permanency plan. The second time Ms. Burke became involved was on August 7, 2015, because Mother arrived at the child's day care intoxicated. When DCS investigated the matter, Ms. Burke recalled that Mother showed signs of intoxication in the home. Ms. Burke testified that Mother's responsibilities remained the same under the second permanency plan but with the addition of anger management classes. Ms. Burke further testified that, under both the

first and second permanency plans, Mother was informed that it was her responsibility to provide evidence to DCS that she had completed each step, with which Mother complied.

Ms. Burke was on the case until March 8, 2016. Ms. Burke admitted on cross-examination that, other than the failure to submit sign-in sheets, Mother has always been compliant with completing each task on the permanency plans. However, Ms. Burke was concerned with Mother's inconsistency; particularly, she was concerned that Mother "can maintain for a short term and she can do very well and she can be compliant with services; however it's concerning that there's been two custodial episodes within a short period of time."

Julie Anna Dennis, the current family service worker, testified that she took over the case on March 8, 2016. At this point, the child was placed with Uncle and Aunt. Ms. Dennis received a call from Mother on March 28, 2016, informing her that Mother had been released from incarceration. As a result, a child and family team meeting and disruption meeting were both held on March 30, 2016. Ms. Dennis testified that adoption was added to the goals on the third permanency plan.

Ms. Dennis testified that Mother's responsibilities under the third permanency plan remained unchanged but that the anger management class requirement from the second permanency plan had been removed. Ms. Dennis further testified that she explained to Mother her responsibility to keep DCS updated and to provide proof as she completed each step on the permanency plan. According to Ms. Dennis, Mother sent her proof of income, deposits into her bank account, attendance at Bible study classes, and a certificate of completion of an Eat Smart class to address the child's feeding issues. Ms. Dennis testified that Mother only provided proof of her attendance at recovery meetings through May 24, 2016. As a result, Ms. Dennis testified that she mailed Mother a copy of the permanency plan on June 21, 2016, reminding Mother that she needed to keep Ms. Dennis informed when any steps on the permanency plan had been completed. Ms. Dennis denied, however, that Mother made any contact with her in June 2016. Ms. Dennis acknowledged that Mother completed and submitted another mental health assessment done by Donise Clemmer in July 2016. Based on the assessment, Ms. Dennis was concerned that "short-term is easy to address but long-term sustainability is at issue." Ms. Dennis testified that she checked with Ms. Clemmer about Mother's participation in individual counseling. According to Ms. Dennis, Ms. Clemmer assured Ms. Dennis that she would "get a letter to present to the Court"; however, Ms. Dennis never received any confirmation as of the date of trial. Ms. Dennis testified that the most important requirements for Mother on the permanency plans were to address her mental health and substance abuse issues. When asked whether Mother had failed any drug screens administered by DCS, Ms. Dennis answered in the negative. Ms. Dennis recalled that Mother tested negative for all substances on the most recent hair follicle drug screen administered in August 2016.

Ms. Dennis testified that the child no longer needs feeding therapy. Since the child had been moved into the current Foster Parents' home, the child has gained weight. Ms. Dennis described the child as being "very, very smart" and "doing very well" in school. According to Ms. Dennis, the child was making friends and participating in sports. Ms. Dennis testified that the child "is considerably ahead of the other children" in kindergarten.

Foster Mother[6] testified that the child had been in her home twice, with the first occurring on September 4, 2015, and the second time on April 8, 2016. According to Foster Mother, the child had "behavioral issues, . . . feeding issues, emotional issues, [and] social issues" when he first came into her care. Foster Mother testified that the child was initially receiving behavioral therapy, family therapy, and feeding therapy. Although the child had been dismissed from feeding therapy, he still is participating in behavioral therapy. Foster Mother described the child's behavior as "defiant" after visits with Mother but then returning to normal behavior once he got back into a regular routine after the visits. Foster Mother testified that the child is doing very well in school and that he is ahead of his class. According to Foster Mother, if the child becomes available for adoption, she and her husband want to adopt the child. Although the child knows who his Mother is, Foster Mother testified that he does not seem to have a bonded relationship with her because "[h]e doesn't speak about her." Foster Mother denied that the child misses Mother. Foster Mother's testimony concluded DCS's proof.

On the second day of trial, counsel for Mother announced that he received a text message from Mother that morning indicating that Mother was not going to be present that day at trial. Counsel for Mother rested his case because neither Mother nor Ms. Clemmer, the witnesses he had planned to call, was present in court. As a result, the guardian ad litem called Linda G. ("Grandmother") as a witness. Grandmother generally testified about how Mother's actions furthered the best interest of the child despite the fact that Grandmother does not appear to have been very close with either the child or Mother. After closing arguments, the trial court made an oral ruling to terminate Mother's parental rights on the grounds of abandonment by wanton disregard for the welfare of the child, persistent conditions, and substantial noncompliance with the permanency plans. The trial court also found that termination of Mother's parental rights is in the child's best interests. The trial court memorialized its ruling by order of October 20, 2016. Mother appeals.

## ISSUES

Mother raises the following issues for our review, which we have slightly restated:

---

[6] Foster Mother's full name is not contained in the transcript.

1. Did the trial court err by terminating the parental rights of the Mother for persistent conditions?
2. Did the trial court err by terminating the parental rights of the Mother for substantial non-compliance with the permanency plan?
3. Did the trial court err by terminating the parental rights of the Mother for wanton disregard?
4. Did the trial court err by finding that termination of the Mother's parental rights was in the best interests of the child?

## STANDARD OF REVIEW

As explained by the Tennessee Supreme Court:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted).

Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.* at 653.

As opined by the Tennessee Supreme Court:

> The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d [387,] 393 [(Tenn. Ct. App. 2009)] (quoting *In re Adoption of A.M.H.*, 215 S.W.3d [793], 810 [(Tenn. 2007)]). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 2016 WL 819593, at *12.

When the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

### DISCUSSION

### Grounds for Termination

The trial court found three grounds for terminating Mother's parental rights: (1) abandonment by wanton disregard for the welfare of the child pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(iv); (2) persistence of conditions pursuant to Tennessee Code Annotated section 36-1-113(g)(3); and (3) substantial noncompliance

with the permanency plans pursuant to Tennessee Code Annotated section 36-1-113(g)(2).

As an initial matter, we note that DCS, in the body of its brief, states that it "does not defend the ground of persistence of conditions . . . but proceeds only the grounds of abandonment by wanton disregard and substantial noncompliance with the permanency plan" on appeal. Based upon DCS's concession, we need not tax the length of this Opinion with an analysis of whether the trial court was correct in terminating Mother's parental rights on the ground of persistence of conditions. *Cf.* **In re I.E.A.**, 511 S.W.3d 507, 514 (Tenn. Ct. App. 2016) (assuming that the trial court was not entitled to rely on the magistrate's previous finding of severe abuse in a dependency and neglect proceeding based on DCS's concession). Our decision does not run afoul of the Tennessee Supreme Court's decision in **In re Carrington H.**, 483 S.W.3d 507 (Tenn. 2016), which ruled that this Court must consider all of the grounds found by the trial court, "regardless of whether the parent challenges these findings on appeal." *Id.* at 525–26. The policy behind this rule is to "ensure that fundamental parental rights are not terminated except upon sufficient proof, proper findings, and fundamentally fair procedures." *Id.* at 525. However, this rule has never been construed to require this Court to also consider the grounds sustained by the trial court and thereafter conceded or waived by the non-parent on appeal. Accordingly, we reverse the trial court's finding of the ground of persistence of conditions and will only consider the remaining grounds found by the trial court and appealed by Mother in this case. We begin with the ground of abandonment by wanton disregard for the welfare for the child.

*Abandonment by Wanton Disregard*

Pursuant to Tennessee Code Annotated section 36-1-113(g)(1), "[a]bandonment by the parent or guardian" constitutes a ground for termination of a parent's parental rights. Tennessee Code Annotated section 36-1-102, in turn, provides several definitions for abandonment. In this case, the petition alleged, and the trial court found, abandonment by an incarcerated parent for wanton disregard under Tennessee Code Annotated section 36-1-102(1)(A)(iv). Section 36-1-102(1)(A)(iv) provides:

> A parent . . . is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent . . . has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . the parent . . . has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv).

The statute "begins by describing the class of people to whom the statute applies." *In re Audrey S.*, 182 S.W.3d 838, 870 (Tenn. Ct. App. 2005). As is evident from the language of the statute, the grounds under section 36-1-102(1)(A)(iv) apply only where "the parent . . . has been incarcerated during all or part of the four (4) months immediately preceding the institution of [a parental termination] proceeding." In this case, the trial court made the following specific findings concerning the ground of abandonment by an incarcerated parent for wanton disregard:

> 7. . . . [Mother] had been to see her probation officer on February 23, 2016. She was already in some trouble as she had not reported the previous month. When asked for a drug screen she had claimed that she could not provide a sample but then admitted that she would test positive for cocaine and hydrocodone. The mother admitted that she had done a "bump" of cocaine the night before seeing her probation officer; testifying that it gave her enough energy to clean her house. As a result, she was arrested for violation of probation. . . . The mother was subsequently incarcerated until March 28, 2016.
>
> * * *
>
> 10. [T]he [c]ourt finds that [Mother] was incarcerated during a portion of the four . . . months immediately preceding the filing of this petition.

Here, the termination petition was filed on April 5, 2016. Because Mother was incarcerated from February 23, 2016, until about March 28, 2016, the entire duration of which lies within the four months preceding the filing of the termination petition, the trial court correctly concluded that the abandonment definition contained in section 36-1-102(1)(A)(iv) was applicable. *See In re Keith W.*, No. W2016-00072-COA-R3-PT, 2016 WL 4147011, at *6 (Tenn. Ct. App. Aug. 3, 2016) (holding that the incarcerated parent definitions for abandonment did not apply because the father was not incarcerated at or in the four months preceding the filing of the termination petition); *In re Navada N.*, No. M2015-01400-COA-R3-PT, 2016 WL 3090908, at *14 (Tenn. Ct. App. May 23, 2016) (describing incarceration within the four months preceding the filing of the termination petition as a "condition precedent" to the application of the abandonment definitions under section 36-1-102(1)(A)(iv)). We will therefore proceed to consider the evidence presented regarding this ground.

With regard to this ground of abandonment, we have explained:

> Incarceration alone is not conclusive evidence of wanton conduct prior to incarceration. *In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005). Rather, "incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm

- 12 -

to the welfare of the child." *Id.* The statutory language governing abandonment due to a parent's wanton disregard for the welfare of a child "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child" and recognizes that a "parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *Id.*

Numerous cases have held that a parent's previous criminal conduct, coupled with a history of drug abuse, constitutes a wanton disregard for the welfare of the child. *See, e.g.*, *State v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *8 (Tenn. Ct. App. Jan. 11, 2005); *In re C. LaC.*, No. M2003-02164-COA-R3-PT, 2004 WL 533937, at *7 (Tenn. Ct. App. Mar. 17, 2004); *State v. Wiley*, No. 03A01-9903-JV-00091, 1999 WL 1068726, at *7 (Tenn. Ct. App. Nov. 24, 1999); *In the Matter of Shipley*, No. 03A01-9611-JV-00369, 1997 WL 596281, at *5 (Tenn. Ct. App. Sept. 29, 1997). "[P]robation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867–68.

*In re C.A.H.*, No. M2009-00769-COA-R3-PT, 2009 WL 5064953, at *5 (Tenn. Ct. App. Dec. 22, 2009).

In its final order, the trial court found that DCS proved by clear and convincing evidence the ground of abandonment by wanton disregard. Specifically, the trial court made the following findings:

10. . . . Prior to [her] incarceration, [Mother] engaged in conduct which exhibits a wanton disregard for the welfare of the child. Not only did [Mother] use cocaine while on probation for another drug related crime; she used while the child was on a trial home placement and in her physical custody.

Although the trial court appears to have focused on Mother's conduct immediately prior to her incarceration, we note that the law in Tennessee is clear that the ground of wanton disregard need not require that the conduct at issue occur within the four month window prior to incarceration. *In re Audrey S.*, 182 S.W.3d at 865 ("This test has no analog to the first statutory definition of abandonment, and it is not expressly limited to any particular four-month period."). Rather, Tennessee courts may consider the parent's behavior throughout the child's life, even when the child is in utero. *See In re A.B.*, No. E2016-00504-COA-R3-PT, 2017 WL 111291, at *10 (Tenn. Ct. App. Jan. 11, 2017)

- 13 -

("For a child in utero, we primarily have found wanton disregard where a parent, after learning of the pregnancy, commits the crime for which he or she is subsequently incarcerated."). *But see* **In re Anthony R.**, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015) (concluding that father's actions that led to his incarceration did not constitute wanton disregard for the child's welfare because father did not know that mother was pregnant with his child). "The actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." **In re Anthony R.**, 2015 WL 3611244, at *3.

In the present case, the evidence establishes that the child had been removed from Mother's care multiple times. While the child was at Safe Families for the third time, Mother willingly moved in with Father in an attempt at reconciliation despite the fact that she has had domestic violence issues with him in the past. During this time, Mother was also arrested for public intoxication and possession of a controlled substance. As a result, Mother left the child with Safe Families for three months, at which time DCS became involved based on Mother's abandonment of the child. Within a month of the child being returned to Mother's full legal custody, however, Mother picked the child up from day care while intoxicated, all the while knowing that she needed to remain sober in order to care for the child as a single parent. Despite Mother's insistence that she only had a couple glasses of wine at 1:00 p.m. while on her lunch date, Mother does not deny that she was **still** intoxicated at 6 p.m. when the child was picked up from day care and again at 8:00 p.m. when DCS arrived at her home. As a result, the child was again removed from Mother's custody.

When the child was again restored to Mother's care on a trial home placement, and Mother was given yet another chance, within two weeks, Mother resorted to using cocaine. Mother attempts to justify her decision to use cocaine based on the fact that she needed the boost of energy to clean the house. At this point, however, Mother was on probation and was well aware that she needed to stay clean or risk incarceration. Her decision to use cocaine while on probation ensured that she would be removed from the child's life. Moreover, despite being aware that she was not to communicate with her boyfriend, Mother decided to leave the child in boyfriend's care when she went in for her rescheduled probation meeting. As previously discussed, "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." **In re Audrey S.**, 182 S.W.3d at 867–68. Although Mother was given many chances to show that she can be an appropriate parent for the child, Mother would repeatedly make poor decisions without any regard for the consequences for the child's safety. Under all of these circumstances,

we therefore conclude that there is clear and convincing evidence to support this ground for termination of Mother's parental rights.[7]

*Substantial Noncompliance with the Permanency Plans*

We next examine the trial court's conclusion that Mother has not substantially complied with the permanency plans prepared by DCS. Parental rights may be terminated under the statute when:

> There has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4.

Tenn. Code Ann. § 36-1-113(g)(2). According to the Tennessee Supreme Court:

> Substantial noncompliance is a question of law which we review de novo with no presumption of correctness. Substantial noncompliance is not defined in the termination statute. The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial. Black's Law Dictionary defines "substantial" as "[o]f real worth and importance." *Black's Law Dictionary* 1428 (6th ed. 1990).

***In re Valentine***, 79 S.W.3d 539, 548 (Tenn. 2002). As discussed by this Court in ***In re M.J.B.***, 140 S.W.3d 643 (Tenn. Ct. App. 2004):

> Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-113(g)(2), [DCS] must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, ***In re Valentine***, 79 S.W.3d at 547; ***In re L.J.C.***, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003), and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of

---

[7] Although this ground for termination of parental rights focuses on the parent's actions prior to incarceration, we note that Mother's reckless behavior continued even after the termination petition had already been filed. Shortly after Mother's release from incarceration on March 28, 2016, Mother was again arrested on April 10, 2016, for failure to appear on an outstanding citation for driving without a license. In addition, Mother's failure to appear for the second day of trial on the petition for the termination of her parental rights without any explanation for her absence, to us, constitutes "an intentional performance of . . . [an] unreasonable act[] and indifference to the consequences of the action[] for the child." ***In re Anthony R.***, 2015 WL 3611244, at *3.

- 15 -

the particular requirement that has not been met. ***In re Valentine***, 79 S.W.3d at 548–49; ***In re Z.J.S.***, 2003 WL 21266854, at *12. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. ***In re Valentine***, 79 S.W.3d at 548; ***Department of Children's Servs. v. C.L.***, No. M2001-02729-COA-R3-JV, 2003 WL 22037399, at *18 (Tenn. Ct. App. Aug. 29, 2003) (No Tenn. R. App. P. 11 application filed).

*Id.* at 656–57.

Here, the child was removed from Mother's custody because of concerns related to her mental health and drug and alcohol abuse. The permanency plans attempted to remedy these conditions by requiring that Mother (1) complete parenting classes; (2) participate in therapeutic visitation; (3) follow aftercare recommendations; (4) submit to random drug screens and pass them; (5) refrain from associating with known drug users; (6) sign a release of information; (7) not incur new criminal charges and follow the rules of probation; (8) cooperate with requirements for parents with children in state custody; (9) comply with all court orders and cooperate with DCS by maintaining contact and sending verification of completion of the goals; (10) visit regularly; (11) attend court hearings and meetings; (12) pay child support; (13) keep a clean and safe home; (14) avoid illegal activity in the home; (15) obtain a legal source of income and provide proof; (16) complete a mental health assessment and follow all aftercare recommendations; (17) indicate a willingness to accept treatment for mental health issues; and (18) address anger management and domestic violence through counseling. We conclude that these requirements were reasonable and related to remedying the conditions that caused the child to be removed.

The trial court, however, found that Mother failed to substantially comply with the requirements of the permanency plans. Specifically, the trial court found that "[Mother] has failed to follow the recommendations from her mental health assessment or the recommendations from her discharge from her substance abuse treatment." Based on Mother's "continual issues with relapse" the trial court concluded that "her continued compliance with aftercare and mental health treatment are necessary for [Mother] to remain sober and stable for her child." Although the trial court acknowledged that "these failures might not rise to the level of substantial non-compliance for all parents," the trial court nevertheless concluded that Mother was required "to strictly comply with these requirements" based on Mother's "continued problems with relapse."

Although we note that this is a close question, we nevertheless conclude that the evidence preponderates against the trial court's findings. Here, there is no dispute that Mother completed each task on the first and second permanency plans, which included generally the same tasks as the third permanency plan. The trial court appears to have improperly based its finding of substantial noncompliance upon the fact that DCS's

desired outcome and goal of Mother remaining drug-free was not reached rather than Mother's efforts to reach the goal outlined by the permanency plans. When considering this ground for termination, however, "outcome achievement is not the measure of compliance[.]" *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009). "Our focus is on the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes." *In re Aiden R.*, No. E2015-01799-COA-R3-PT, 2016 WL 3564313, at *9 (Tenn. Ct. App. June 23, 2016) (no perm. app. filed); *see In re Heaven J.*, No. W2016-00782-COA-R3-PT, 2016 WL 7421381, at *10–11 (Tenn. Ct. App. Dec. 22, 2016) (holding that the evidence did not rise to the level of clear and convincing on the ground of substantial noncompliance when father made "considerable efforts and substantial progress" toward his tasks on the permanency plan); *Tenn. Dep't of Children's Servs. v. P.M.T. et al.*, 2006 WL 2644373, at *8 (Tenn. Ct. App. 2006) ("Tenn[essee] Code Ann[otated section] 36-1-113(g)(2) does not require substantial compliance with a permanency plan's 'desired outcome[s],' rather it requires substantial compliance with a plan's statement of responsibilities, i.e., the actions required to be taken by the parent or parents."); *cf. In re Eddie F.*, No. E2016-00547-COA-R3-PT, 2016 WL 7029285, at *6 (Tenn. Ct. App. Dec. 2, 2016), *app. denied* (Mar. 2, 2017) ("Although [m]other certainly failed to comply with some requirements of the permanency plan, we cannot agree that [m]other's relapse 'undid' all of her previous and subsequent attempts to substantially comply with the requirements of her permanency plans.").

The evidence in the record shows that, after the creation of the third permanency plan, Mother completed her treatment at Bradford to address her substance abuse issues in May 2016. The discharge letter from Bradford indicates that Mother "participated positively" in her treatment and completed all treatment expectations. In addition, Mother passed the hair follicle drug screen administered in August 2016. DCS has presented no proof that Mother failed any drug screen that it administered to her over the course of the two to three years that DCS had been involved with the family.

DCS, however, takes issue with the fact that Mother (1) failed to continue with Bradford's weekly aftercare program for one year and (2) failed to submit sign-in sheets to prove her attendance at recovery support groups. Mother asserts that she stopped attending aftercare because she believed that aftercare and recovery meetings are synonymous, while DCS argues that Mother was required to participate in both based on a letter from Bradford. Although we agree with DCS that Mother's "discharge recommendations" from Bradford include both aftercare and recovery meetings, we note that that the language of the third permanency plan does create some confusion regarding Mother's requirements. Specifically, the third permanency plan requires the following:

> [Mother] . . . will indicate a willingness to accept treatment for the [substance abuse] issues . . . and any additional issues identified by the therapist and will follow all treatment recommendations **until released**

**upon successful completion**.    [Mother] will provide verification of participation in recommended **aftercare programs such as AA/NA meetings.**

(emphasis added). As discussed above, the requirement that Mother follow all treatment recommendations until her release from Bradford had been satisfied as evidenced by Bradford's letter. Based on the second sentence of this action step drafted by DCS, however, recovery meetings appear to satisfy the aftercare requirement under the permanency plan. As such, we cannot say that Mother was in substantial noncompliance with the **permanency plan** based on her failure to attend aftercare; rather, it appears that she substantially complied with this requirement.

With respect to the recovery meetings, there is some evidence in the record to show that Mother participated in recovery meetings based on the one sign-in sheet entered into evidence by DCS.  According to Mother's testimony, she continued to attend recovery meetings despite her failure to submit sign-in sheets.  DCS does not dispute that Mother continued with her recovery meetings; rather, DCS contends that Mother's failure to provide sign-in sheets to prove that she attended meetings constitutes noncompliance with the permanency plan's requirements.  To Mother's credit, however, only the third permanency plan specifically mentions the requirement that Mother "provide verification" of her attendance at the recovery meetings.  Nevertheless, the trial court failed to make any credibility findings on this issue. Mother's failure to submit sign-in sheets, standing alone, does not rise to the level of substantial noncompliance. *See **In re M.J.B.***, 140 S.W.3d 643, 656 ("Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance."). Based on our review of the record, we cannot say that the evidence presented by DCS rises to the level of clear and convincing that Mother failed to comply with this requirement under the permanency plans.

The record also shows that, in order to address Mother's mental health issues, Mother completed a mental health assessment in April 2016 and began individual counseling with Omni until her discharge in June 2016.  Although the evidence is conflicting with respect to whether Mother was discharged for non-compliance with care or because her therapist left Omni, the record shows that Mother was able to resume her individual counseling at Omni in September 2016.  There is some question that Mother was discharged as a patient for noncompliance with care; it appears from the record that Mother was still being seen by a counselor at Omni for medication management from June 2016 through August 2016, during her alleged period of discharge.  Regardless of the reason, it appears to us that Mother exerted some effort to fix the issues with Omni so that she could comply with the required counseling under the permanency plans. Before Mother was able to resume individual counseling with Omni, Mother testified that she saw Ms. Clemmer individually for counseling in the interim.  Ms. Dennis does not appear

to have denied the existence of this evidence; rather, she admitted that she talked to Ms. Clemmer, who allegedly told Ms. Dennis that she would submit the required paperwork.

Considering Mother's efforts as a whole for the two to three years over the course of three permanency plans, we cannot conclude by clear and convincing evidence that Mother was in substantial noncompliance with the permanency plan requirements. At trial, Ms. Dennis placed particular importance on Mother's need to address her substance abuse and mental health issues. While we agree that these requirements should be assigned significant weight given Mother's history in this case, however, as discussed above, Mother submitted to the required assessments, treatments, and individual counseling. Accordingly, notwithstanding her failure to consistently submit sign-in sheets and attend aftercare, Mother was in compliance with most of the important tasks under the permanency plans. We acknowledge that Mother's inability to remain sober prevented the safe reintegration of the child into her life; however, this is not the focus of this ground for termination of parental rights. Rather, as previously discussed, "[o]ur focus is on the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes." *In re Aiden R.*, 2016 WL 3564313, at *9. In light of these considerations, we conclude that the evidence does not clearly and convincingly establish that Mother was in substantial noncompliance with the permanency plans.

### Best Interests of the Child

When at least one ground for termination of parental rights has been established, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge. *In re Audrey S.*, 182 S.W.3d at 877. The focus shifts to the child's best interest. *Id*. Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. *Id*. However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *Moody*, 171 S.W.3d at 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. These factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to affect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). This Court has noted that, "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M. A. R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Audrey S.*, 182 S .W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

- 20 -

The trial court found that it was in the best interest of the child to terminate Mother's parental rights. The trial court found that Mother has not made an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in her home. *See* Tenn. Code Ann. § 36-1-113(i)(1)–(2). The evidence does not preponderate against this finding, which weighs in favor of termination. Here, the record shows that the child was removed from Mother's care multiple times. Every time that the child was released back into her care, Mother would shortly thereafter relapse. Mother was aware that she was on probation but chose to drink and use cocaine without regard for the consequences. As of the date of trial, Mother continues to be on probation and risks being incarcerated once again if she relapses.

In addition, the trial court found that the child is "happy and thriving" and "rarely asks about his birth family." *See* Tenn. Code Ann. § 36-1-113(i)(4). The evidence does not preponderate against this finding, which weighs in favor of termination. Here, Foster Mother testified that the child's behavior has improved ever since he has been in Foster Parents' care. Specifically, the child became less defiant, is eating better, and is ahead of his class in school. Ms. Dennis also observed that the child appears to be thriving in his current environment. Despite the fact that the child has been in Mother's care sporadically for most of his life, the record shows that the child has stopped asking about Mother in the months leading up to trial.

There is also evidence of alcohol and cocaine use by Mother while the child was in her custody, rendering her unable to consistently care for the child in a safe and stable manner. *See* Tenn. Code Ann. § 36-1-113(i)(7). Here, each time the child was returned to Mother's care, she would relapse within a month. Although Mother appears to be perfectly able to maintain sobriety in the short-term, Mother has shown difficulty maintaining sobriety in the long-term. As of the date of trial, Mother has only been sober for seven-and-a-half months, allowing little assurance that she will be able to maintain her current sobriety long-term. It is also significant that Mother is still in contact with her boyfriend, who also abused alcohol in the past and with whom she was required to avoid contact. Accordingly, this factor weighs in favor of termination.

Not all factors, however, weigh clearly in favor of termination. First, there is some doubt that the child's mental, emotional, or medical condition would suffer harm if the child was required to maintain contact with Mother. *See* Tenn. Code Ann. § 36-1-113(i)(5). The record shows that the child is doing very well in foster parents' care and that the child worked through some behavioral issues that allegedly stemmed from his visits with Mother. Still, nothing in the record indicates that the child suffered any harm while under Mother's care. Accordingly, this factor favors neither party in this case.

There also is no evidence that Mother has ever "shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child." *See* Tenn. Code Ann. §

- 21 -

36-1-113(i)(6). Indeed, other than the one incident in which Mother left the child in the car in 2012, there is nothing in the record to suggest that the child was in any way abused or neglected each time the child was returned to Mother's care upon her completion of the permanency plan requirements. Accordingly, this factor favors neither party in this case.

DCS has also not presented much evidence to demonstrate that Mother's mental and/or emotional status would be detrimental to the child or prevent her from effectively providing safe and stable care and supervision for the child. *See* Tenn. Code Ann. § 36-1-113(i)(8). Here, although Mother was diagnosed with Antisocial Personality Features and Narcissistic Personality Features as of the date of trial, the record shows that Mother is participating in individual counseling in order to address these issues. As such, this factor also favors neither party.

Moreover, as of the date of trial, Mother was current on her child support obligations. *See* Tenn. Code Ann. § 36-1-113(i)(9). Mother was working full-time at ProLogics and owns a mobile salon business. In addition, there is no evidence that Mother has refused any visitation with the child that was offered to her. *See* Tenn. Code Ann. § 36-1-113(i)(3). As such, these factors weigh against termination.

Although Mother has shown some willingness to complete the permanency plans in order to regain custody of the child, it was Mother's own decisions each time that led to the child's removal from her home. Specifically, Mother voluntarily drank alcohol and became intoxicated for at least seven hours despite her awareness that she had substance abuse problems in the past. In addition, Mother voluntarily used cocaine with a co-worker not even two weeks after the child was returned to her care on a trial basis, all the while knowing that she risked incarceration based on the violation of her probation and the child being removed from her care. Mother also admitted to using hydrocodone during this time. As a result, the child was shuffled from home to home, having been moved around approximately thirteen times in his life. The best interests of the child are therefore furthered by allowing the child to remain in the Foster Parents' care and to move on from the uncertainty that would result from his relationship with Mother. Based on the totality of the circumstances, we conclude that clear and convincing evidence supports the trial court's conclusion that termination of Mother's parental rights is in the child's best interest.

CONCLUSION

The judgment of the Knox County Juvenile Court is reversed with respect to the ground of persistence of conditions and substantial noncompliance with the permanency plans and affirmed with respect to the ground of abandonment by wanton disregard for the welfare of the child. The determination that termination is in the child's best interest is affirmed. This cause is remanded to the trial court for further proceedings as may be

necessary and are consistent with this Opinion. Costs of this appeal are taxed to the Appellant, Rebecca B., for which execution may issue if necessary.


_____
J. STEVEN STAFFORD, JUDGE